UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CATHERINE VASQUEZ-ORTIZ,

        Plaintiff,

v.                                 Case No.  8:04-cv-1570-T-23TBM

PHC PARTNERS INC., d/b/a
PEDIATRIC HEALTH CHOICE,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

    THIS MATTER is before the court on referral by the Honorable Steven D. Merryday

for a Report and Recommendation on **Defendant's Motion for Summary Judgment** (Doc.

24).  By its motion, Defendant seeks summary judgment on all claims raised by Plaintiff.  As

grounds, Defendant argues that Plaintiff cannot establish a *prima facie* case for any of her

claims.  Alternatively, Defendant argues that it laid off Plaintiff as part of a reduction in force,

and Plaintiff cannot show that the legitimate business reason proffered by Defendant is

pretextual.  Plaintiff filed a response in opposition (Doc. 33).  The parties filed affidavits and

exhibits in support of their respective positions.  See (Docs. 25-28, 33-36, 37).

I.

    The undisputed facts establish that Plaintiff Catherine Vasquez-Ortiz was employed as

a customer service representative for Defendant PHC Partners, Inc., d/b/a Pediatric Health

Choice (hereinafter "Defendant" or "PHC"), from January 7, 2002, through March 26, 2004.

PHC is a provider of pediatric health care products and services.  Plaintiff was assigned to the

"Dr. Neb" program, which coordinates the distribution of nebulizers, apparatus used for

inhalation therapy.  In this position, Plaintiff coordinated and prepared the paperwork and

nebulizers for distribution to doctors' offices, received and verified paperwork from doctors'

offices, called and followed up with doctors' offices and insurance companies, entered

information into the computer, and submitted required paperwork to billing.[1]  She also

answered the telephone when the receptionist was absent.

In October 2003, Plaintiff advised PHC that she had Friedreich's Ataxia, a

neurological disease.  Plaintiff gave to Lynn Tran, PHC's Vice President of Administration, a

letter to PHC dated October 6, 2003; a Family Medical Leave Act (hereinafter "FMLA") form

completed by her physician, Dr. Newman, on October 3, 2003; and some of her and her

brother's medical records.  See (Doc. 33-9).[2]  By her letter, Plaintiff stated:

> As you are well aware of my disease (Friedreich's Ataxia)
> and the symptoms that accompany it, this letter is to inform
> you that my Neurologist (Dr. Newman) has recommended
> that I do Physical Therapy twice a week for an extensive
> period of time. . . . This letter is to inform Pediatric Health
> Choice that due to this disease there may be days when I my
> [sic] legs go out and I am unable to come into work or may
> be times when I have to get up from my seat more than usual
> due to the pain I have.  If there are days when I am not able
> to come in to work I will be able to do some work from home

---

[1]A complete job description is filed as Exhibit 8 to Plaintiff's deposition.  See (Doc. 28-3 at 4-5).

[2]These documents are also submitted as exhibits to Plaintiff's deposition.  See (Doc. 28-3 at 8-16).

> if that is acceptable.  My therapy will be scheduled on
> Mondays & Wednesdays. . . .

<u>Id.</u> at 1.  On the FMLA form, the physician responded in handwriting to questions on the form

concerning leave as follows:

> 3.  Page 4 describes what is meant by a "serious health condition" under the
> Family and Medical Leave Act.  Does the patient's condition[] qualify
> under any of the categories described?  If so, please check the applicable
> category.
>
> (1) _____ (2) __✓__ (3) _____ (4) _____ (5) _____ (6) __✓__ , or None of the above _____

<u>Id.</u> at 2 (footnote omitted).

In explanation, the form provides:

> 2.  <u>Absence Plus Treatment</u>
> _____(a)  A period of incapacity[]of more than three consecutive calendar days
> (including any subsequent treatment or period of incapacity relating to
> the same condition), that also involves:
> (1)  Treatment[] two or more times by a health care provider, by a
> nurse or physician's assistant under direct supervision of a health
> care provider, or by a provider of health care services (e.g.,
> physical therapist) under orders of, or on referral by, a
> health care provider; or
> (2)  Treatment by a health care provider on at least one occasion
> which results in a regimen of continuing treatment[] under the
> supervision of the health care provider.
>
> 6.  <u>Multiple Treatments (Non-Chronic Conditions)</u>
> Any period of absence to receive multiple treatments (including any period of
> recovery therefrom) by a health care provider or by a provider of health care
> services under orders of, or on referral by, a health care provider, either for
> restorative surgery after an accident or other injury, or for a condition that
> would likely result in a period of incapacity[] of more than three consecutive
> calendar days in the absence of medical intervention or treatment. . . .

<u>Id.</u> at 5.

The physician also responded:

>    7. a. If medical leave is required for the employee's absence from work because
>        of the employee's own condition (including absences due to pregnancy or
>        a chronic condition), is the employee unable to perform work of any kind?
>
>            N/A
>
>    b. If able to perform some work, is the employee unable to perform any one
>        or more of the essential functions of the employee's job (the employee or
>        the employer should supply you with information about the essential job
>        functions)?  If yes, please list the essential functions the employee is
>        unable to perform:
>
>            N/A
>
>    c. If  neither a. nor b. applies, is it necessary for the employee to be absent from
>        work for treatment?"
>
>            Yes.

Id. at 3.  Additionally, the doctor noted on the form that "Patient has neuromuscular pain --

physical therapy recommended."  Id. at 4.

Plaintiff missed work intermittently from October 2003 through March 2004 because

of physical therapy appointments, pain injections, and hospitalization resulting from an adverse

reaction to the injections.  She was absent from work from March 16, 2004, through March

19, 2004.  During this time, she submitted a "Disability Certificate" from the UCH Emergency

Department that stated:  "According to my diagnosis, this patient was physically unable to

perform his or her job duties: From 3/16/04 To 3/18/04. Remarks: No work due to illness."

and a script from the Tampa Pain Relief Center dated March 19, 2004, indicating,  "WORK

STATUS  Off work, may return to work on Monday 3/22/04."[3]  (Doc. 33-2).

---

[3]It is unclear when these documents were submitted to PHC or who at PHC received
them.  In her deposition, Plaintiff testified that she could not have taken it to PHC, so she
supposed that "Bea had to have taken it . . . and dropped it off to Cherlyn [Stokes]."  Depo. of
Catharine Vasquez-Ortiz (Doc. 28 at 123).  "Bea" appears to be Beatrice Perez, Plaintiff's
partner at the time.  See id. at 10-11.  Plaintiff admitted she was not there when the documents
were delivered, but she testified that PHC knew she was in the hospital because "they" called

Shortly after her return to work, on or about March 26, 2004, in a meeting with Lynn Tran and Cherlyn Stokes, Customer Service Manager and Plaintiff's direct supervisor, Plaintiff was informed that her position was being eliminated and that she was being laid off.

Plaintiff filed a charge of discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission (hereinafter "EEOC") on May 9, 2004.  After receiving a Notification of Right to Sue from the EEOC, Plaintiff filed the instant action alleging FMLA interference (Count I); FMLA discrimination (Count II); hostile work environment discrimination pursuant to the Americans with Disabilities Act (hereinafter "ADA") of 1990, 42 U.S.C. §§ 12101-12117 (Count III); discrimination in violation of the Florida Civil Rights Act (hereinafter "FCRA"), Florida Statutes chapter 760 (Count IV); retaliation in violation of Title VII (Count V); and retaliation in violation of FCRA (Count VI). See (Doc. 10).  Plaintiff seeks back pay and benefits, interest on back pay and benefits, front pay and future benefits, loss of future earning capacity, damages for emotional pain and suffering, punitive damages, liquidated damages, reinstatement, attorney's fees and costs, and injunctive relief.  See id.

By the instant motion, Defendant seeks summary judgment on all counts.  As grounds, Defendant argues that Plaintiff is unable to prove any of her claims because she did not suffer nor did she claim to suffer from a serious health condition that prevented her from performing her work; she was not disabled by her condition or regarded as disabled; she was granted all leave requests; and she was laid off as part of a reduction in force (hereinafter

---

her there and sent her flowers.  Id.

5

"RIF"), rather than as a result of any discrimination or retaliation.[4]  With respect to Plaintiff's claim of hostile work environment caused by the actions and remarks of Robert Anderson, PHC's Vice President of Home Medical Equipment and Marketing, Defendant argues that Plaintiff failed to utilize PHC's complaint procedure or otherwise discuss the alleged remarks or behavior with anyone at PHC.

Plaintiff responds generally that she suffers from a serious health condition which was well known to her supervisors.  She maintains that instead of being reinstated to her former position after a short medical leave, she was unlawfully "laid off" or terminated because of her illness or disability and not pursuant to a legitimate RIF.  By her argument, the stated reason for her termination was pretextual.  In support, she cites to PHC's hiring of other employees by the Defendant, Plaintiff's seniority and work performance, PHC's lack of documentation to support the layoff and absorption of Plaintiff's job, and contradictory statements of decision makers.  Plaintiff argues that she has presented a *prima facie* case of violations of the FMLA and the ADA and sufficient evidence of pretext, and she urges the court to deny Defendant's motion for summary judgment in its entirety.

---

[4]Defendant also claims that on multiple occasions clients complained that Plaintiff was rude during phone conversations.  Plaintiff was counseled by a supervisor for this problem and, a few months before her layoff, removed from the responsibility of contacting doctors or patients.  She was also counseled for spending too much time surfing the internet.  It also asserts that Plaintiff declined the opportunity for cross-training for the intake position at the company.

II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed. R. Civ. P. 56(c). The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. Celotex, 477 U.S. at 324; Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. Perkins v. School Bd. of Pinellas County, 902 F. Supp. 1503 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." Hairston, 9 F.3d at 919 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is

whether there exists genuine and material issues of fact to be tried.  <u>Hairston</u>, 9 F.3d at 921;

<u>see also</u> <u>Little v. United Techs., Carrier Transicold Div.</u>, 103 F.3d 956, 959 (11th Cir. 1997).

All the evidence and inferences from the underlying facts must be viewed in the light most

favorable to the nonmoving party.  <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1526 (11th

Cir. 1997).


III.

A.

Under the FMLA, employees are entitled to "12 workweeks of leave during any 12-

month period . . . [b]ecause of a serious health condition that makes the employee unable to

perform the functions of the position of such employee," and the right following leave "to be

restored by the employer to the position of employment held by the employee when the leave

commenced" or to an equivalent position.  29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1).

 The regulations define "serious health condition" as

> an illness, injury, impairment, or physical or mental condition that
> involves . . .
>
> (1) Inpatient care in a hospital . . .
>
> (2) Continuing treatment by a health care provider.  A
> serious health condition involving continuing treatment by a
> health care provider includes any one or more of the following:
>
> (i) A period of incapacity (i.e., inability to work, attend school or
> perform other regular daily activities due to the serious health condition,
> treatment therefor, or recovery therefrom) of more than three
> consecutive calendar days, and any subsequent treatment or period of
> incapacity relating to the same condition, that also involves:

8

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. . .

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious condition.  A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.114.

The FMLA permits employees two types of claims:  interference claims and retaliation claims.  "In an interference claim, the employee must show only that he or she 'was entitled to the benefit denied.' In contrast, with a retaliation claim the employee faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'"  See Russell v. North Broward Hosp., 346 F.3d 1335, 1340 (11th Cir. 2003); Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206 (11th Cir.  2001); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353-54 (11th Cir. 2000); see also 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c).

B.

With respect to Plaintiff's claims under the FMLA, Defendant argues that Plaintiff is unable to establish the elements for a *prima facie* case of interference or retaliation.  In order to state a *prima facie* claim of interference pursuant to the FMLA, Plaintiff must demonstrate that (1) she was entitled to a substantive FMLA right, and (2) Defendant denied her that right.  Strickland, 239 F.3d at 1208.  In arguing that Plaintiff cannot meet either element of an interference claim, Defendant construes Plaintiff's claim as for a denial of leave.  By her response, Plaintiff clarifies that her interference claim is based on the failure of Defendant to restore her to her former position or an equivalent position after her return from leave in March 2004.

Defendant first argues that Plaintiff was not entitled to leave under the FMLA because she did not suffer a "serious health condition" that made her unable to perform the functions of her position.  Defendant does not dispute that Plaintiff was inflicted with Friedreich's Ataxia, a progressive condition, and that doctors' reports *after* Plaintiff left PHC refer to symptoms such as dizziness, blindness, deafness, impaired motor skills, slurred speech, and club feet.  Defendant concedes that Plaintiff did discuss her problems with Ms. Stokes and controller Heidi Tosti.  However, Defendant argues that during her employment with PHC, Plaintiff was capable of performing all her job duties and the company was unaware of any duties Plaintiff was unable to perform because of her condition.  It maintains that the only symptoms Plaintiff exhibited while she was employed were occasional difficulties with her balance, numbness of hands and legs, and an inability to sit or stand for extended periods.  Citing to Plaintiff's

10

deposition, Defendant notes that Plaintiff could walk for up to three hours at a time without the assistance of a cane, crutches, or a walker; she could sit for two or three hours at a time; she could climb stairs to take her smoke breaks; she could perform her regular daily activities; and she engaged in recreational activities during a vacation in the mountains of North Carolina. It urges that, by her own admission, there were no job duties Plaintiff could not perform because of her condition.

Additionally, Defendant argues that Plaintiff's time off did not constitute FMLA leave. In particular, Defendant argues that the FMLA form filled out by her physician gave no mention of the need for leave and made no mention of the need for pain shots or pain therapy. Thus, Defendant argues that the three days off in March 2004, necessitated by the side effects from a pain shot, were outside the scope of her continuing treatment, and PHC had no way to discern that the time off qualified as FMLA leave. Moreover, she never gave notice of her intention to take FMLA leave, and her requests for time off were not made in writing and thirty days in advance, in accordance with PHC's "Leaves of Absence" policy. By Defendant's argument, Plaintiff was not entitled to the leave under the FMLA because she never requested FMLA-qualifying leave; even if she had requested FMLA-qualifying leave, Ms. Tran was not aware of such a request, and therefore the matter of FMLA leave could not have factored into her decision to lay off Plaintiff.

In response, Plaintiff argues that her condition and symptomology were serious, noticeable and documented. First, the FMLA form completed by Plaintiff's physician indicates that Plaintiff suffers from Friedreich's Ataxia and identified two categories that qualify the

condition as a "serious health condition." <u>See</u> (Doc. 33-9 at 2).   Plaintiff contends that, during her employment with PHC, she suffered from symptoms such as difficulty sitting or standing for long periods; losing her balance, bumping into walls, and falling when she walked; numbness in her hand, which caused her difficulty writing; and difficulty speaking.  Plaintiff notes that one individual who complained about Plaintiff's phone skills accused her of being drunk because of her slurred speech.  <u>See</u> Depo. of Catharine Vasquez-Ortiz (Doc. 28 at 88-89).  Plaintiff also notes that her difficulty walking caused her to fall and injure her knee at work, and she was unable to carry large boxes of nebulizers due to weakness in her legs.  <u>See</u> <u>id.</u> at 44, 47, 55.  Cherlyn Stokes, Plaintiff's direct supervisor, testified that she recalled times when Plaintiff would put her hand on the wall to steady herself when she was walking.  Depo. of Cherlyn Stokes (Doc. 34-3 at 11).[5]  Additionally, it is undisputed that Plaintiff received continuing treatment by a health care provider for her Friedreich's Ataxia and she received in-patient care in a hospital after she suffered an adverse reaction to a pain injection treatment for her condition.  <u>See</u> 29 C.F.R. § 825.114(a)(1), (2).

Upon consideration of the proffered evidence, there remains significant facts in dispute regarding the severity and impact of Plaintiff's health condition on her ability to perform her job duties.  Defendant urges that the medical evidence and Plaintiff's admission that she was able to perform her job at PHC and that she performed it well throughout her tenure at PHC, <u>see</u> Depo. of Catherine Vasquez-Ortiz (Doc. 128 at 43, 165-66), contradict any contention that she suffers from a serious health condition that rendered her "unable to perform the

---

[5]Pinpoint citations used herein refer to the page number of the pleadings rather than the deposition transcript pages in instances where they differ.

functions of the position of such employee" under 29 U.S.C. § 2612(a)(1)(D). However, when viewed in a light most favorable to the Plaintiff, the evidence is sufficient to demonstrate that she suffered from such a "serious health condition" within the coverage of the FMLA.[6]

As for the contention that Plaintiff failed to request FMLA leave or give notice of her intention to take FMLA-qualifying leave, as Defendant points out, the FMLA form completed by her physician did not indicate that Plaintiff would need medical leave or need to work intermittently or less than a full schedule.[7] See (Doc. 33-9 at 2). However, while the form does not indicate that Plaintiff would require medical leave, it did indicate that she would be absent from work for treatment and the physician's notes indicated that Plaintiff has neuromuscular pain. See id. at 3. Other evidence further suggests that Defendant was aware that Plaintiff's requests for leave were intended as FMLA leave. Plaintiff's letter of October 6, 2003, accompanying her physician's FMLA form expressly indicated her anticipation of or her intent to take leave due to physical incapacitation, pain, and physical therapy. See (Doc. 33-9

---

[6]To the extent that Defendant argues that Plaintiff's condition did not qualify her for FLMA leave, in a light most favorable to Plaintiff, it did. While Plaintiff testified that she was generally able to perform the duties of her job, there were times when she could not. Defendant's argument here takes too narrow a view of her right to FLMA leave. A fair reading of 29 U.S.C. § 2612 allows, in some circumstances, for an employee to take FLMA leave intermittently and on a reduced leave schedule when medically necessary. See 29 U.S.C §§ 2612 (a)(1)(D) and (b). In a light most favorable to the Plaintiff, her condition occasionally rendered her incapable of performing her job duties and made it medically necessary that she take leave. Defendant knew this as such was adequately forecast by her doctor and the Plaintiff herself. The leave necessitated from March 16-19, 2004, was arguably FMLA qualified leave necessitated by her medical condition.

[7]Again, it is worth noting that while Defendant argues this motion as if the alleged FLMA interference related to leave, Plaintiff asserts that the interference arose from her dismissal, rather than reinstatement, after returning from FLMA leave.

13

at 1).  Cherlyn Stokes testified that Plaintiff requested time off for her condition, specifically because she was having some pain and for doctor's appointments and physical therapy. See Depo. of Cherlyn Stokes (Doc. 34-2 at 48-49).  She further testified that when Plaintiff needed time off, Plaintiff would let Ms. Stokes know what she needed, and Ms. Stokes would put it on the customer service calendar.  See id. at 49; see also Email from Cherlyn Stokes to Catherine Vasquez-Ortiz (Feb. 24, 2004) (Doc. 33-10 at 1).  Contrary to Defendant's suggestion, it does not appear that PHC required Plaintiff to follow a specific or formal procedure in order to request or take FMLA leave, and PHC had adequate notice of Plaintiff's requests for FMLA leave.  See 29 C.F.R. § 825.303(b) ("The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed."); Langlois v. City of Deerfield Beach, Fla., 370 F. Supp. 2d 1233, 1239 (S.D. Fla. 2005) ("Pursuant to the reasoning in Strickland, it is irrelevant whether the employee requested FMLA protection or not.").  Moreover, the statute provides that when leave is foreseeable based on planned medical treatment, the employee shall provide thirty days' notice or, if the treatment is to occur in less than thirty days, as soon as practicable.  29 U.S.C. § 2612(e)(2). Thus, at this stage of the proceedings, the evidence is sufficient to establish that Plaintiff requested FMLA-qualified leave.

Accordingly, Plaintiff has satisfied the first element of an interference claim, that is, she was entitled to a substantive right under the FMLA.

With respect to the second element, that she was denied an FMLA substantive right, Defendant contends it granted Plaintiff all time off she requested and thus there was no

14

interference with any substantive right.  However, as noted above, Plaintiff clarifies in her response that her interference claim is not based on the denial of leave but instead on the failure of Defendant to reinstate her to her former position or an equivalent position after her return from FMLA leave.  By her contention, she took FMLA qualified leave from March 16-19, 2004, and, upon her return, rather than being restored to her former position or an equivalent position, she was terminated on March 26, 2004, in violation of the Act.[8]  While not necessarily in direct response to Plaintiff's argument, Defendant argues that it laid off Plaintiff as part of a RIF and upon legitimate management considerations.  Defendant also maintains that the decision maker, Ms. Tran, had no knowledge of the FMLA leave and therefore could not have factored Plaintiff's leave into her decision.

Accepting the Plaintiff's framing of the interference claim, I find this a very close issue.  The record indicates that the Plaintiff was periodically absent from work due to her condition.  On March 19, 2004, Plaintiff received a facet injection for her back and suffered paralysis from her waist down.  She was hospitalized, but she did return to work the following Monday.  By her testimony, when she returned to work, she found that she no longer had responsibilities for Medicaid billing and pharmacy billing and then was laid off two days later.  The change in her job duties does not appear to be the basis for her claim of interference.  Instead, it is her termination two days after returning to work that she claims violated the FMLA.  To support the claim, she relies primarily on the close temporal proximity between her return from leave

---

[8]The court notes that March 19, 2004, was a Friday; March 22, 2004, was a Monday; and March 26, 2004, was a Friday.

15

and her termination and evidence that she claims shows that the stated reason for her

termination, the RIF, was a pretext.  In this light, the factual basis for this claim is substantially

the same as her claim of FMLA discrimination discussed below.  Implicitly, the Eleventh

Circuit has approved the filing of both claims arising from the same circumstances.  See

O'Connor, 200 F.3d at 1352-53.  The decision is also instructive as to the appropriate

disposition on this motion.

In O'Connor, the court rejected the plaintiff's assertion that all FMLA rights, including

reinstatement, are absolute.  Citing to Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1157 (7th Cir.

1997), the court noted that unlike the right to commence leave, Department of Labor

regulations qualifies the employee's right to reinstatement and allows an employer to deny the

right to reinstatement in certain circumstances:

> (a) An employee has no greater right to reinstatement or to
> other benefits and conditions of employment than if the
> employee had been continuously employed during the FMLA
> leave period. An employer must be able to show that an
> employee would not otherwise have been employed at the time
> reinstatement is requested in order to deny restoration to
> employment. For example:
> (1) If an employee is laid off during the course of taking
> FMLA leave and employment is terminated, the employer's
> responsibility to continue FMLA leave, maintain group health
> plan benefits and restore the employee cease at the time the
> employee is laid off, provided the employer has no continuing
> obligations under a collective bargaining agreement or
> otherwise. An employer would have the burden of proving that
> an employee would have been laid off during the FMLA leave
> period and, therefore, would not be entitled to restoration.

29 C.F.R. § 825.216(a)(1), cited in O'Connor, 200 F.3d at 1354.  When an employee alleges

that she has been denied the FMLA right to reinstatement, "the employer has an opportunity to

demonstrate it would have discharged the employee even had she not been on FMLA leave."

O'Connor, 200 F.3d at 1354.  The court determined that because the employer had terminated

plaintiff as part of a RIF even though she was on FMLA leave *and* the plaintiff never

challenged the legitimacy of this reason, plaintiff's interference claim failed.

Here, Defendant also claims that it was justified in terminating Plaintiff's employment

as part of a RIF.  However, unlike the employee in O'Connor and as discussed below, Plaintiff

proffers some evidence sufficient to raise a genuine issue of material fact as to the true reason

for PHC's failure to reinstate the Plaintiff following her FMLA leave.  Given the close

temporal proximity between Plaintiff's return from leave and her termination and given the

dispute concerning the legitimacy of the RIF, summary judgment is precluded as to Plaintiff's

FMLA interference claim.  Accordingly, the motion should be denied as to Count I.

## C.

By her retaliation claim, Plaintiff asserts that her termination also constituted

discrimination or retaliation for taking medical leave pursuant to the FMLA.  To state a claim

of retaliation under the FMLA, an employee must allege that (1) she engaged in a statutorily

protected activity; (2) she suffered an adverse employment decision; and (3) the decision was

causally related to the protected activity.  Walker v. Elmore County Bd. of Educ., 379 F.3d

1249, 1252 (11th Cir. 2004) (citing Strickland, 239 F.3d at 1207).  To succeed on a retaliation

claim, an employee must demonstrate that his employer intentionally discriminated against her

in the form of an adverse employment action for exercising an FMLA right, i.e., that the

employer's actions "were motivated by an impermissible retaliatory or discriminatory animus."

17

Strickland, 239 F.3d at 1207 (citing King, 166 F.3d at 891).  When evaluating a FMLA

retaliation claim, the courts apply the burden shifting analysis set out in McDonnell Douglas

Corp. v. Green, 411 U.S. 792 (1973).  Smith v. BellSouth Telecomms., Inc., 273 F.3d 1303,

1314 (11th Cir. 2001).

Defendant argues that Plaintiff did not engage in statutorily protected activity, again

because she did not have a serious health condition for which she was entitled to leave and

because she never requested FMLA leave.  In light of my previous findings that Plaintiff has a

serious health condition and that she has sufficiently demonstrated for present purposes that

she took qualified leave under the FMLA, she has satisfied the first element, that she engaged

in statutorily protected activity.  Defendant does not dispute that Plaintiff suffered an adverse

employment action, the second element of a retaliation claim.  As to the third element, that the

decision was causally related to the protected activity, Defendant argues that Plaintiff's

termination occurred as a result of a legitimate business decision to reduce costs and that Lynn

Tran, the decision-maker, was not aware of any requests by Plaintiff for FMLA-qualifying

leave.  By its contention, it cannot be liable for retaliation for protected activity of which it had

no knowledge.  In its interrogatory responses, however, Defendant identified Cherlyn Stokes,

Lynn Tran, and Steve Barry as the individuals who participated in the decision to terminate

Plaintiff's employment, see (Doc. 35-2 at 4), and it is undisputed that Ms. Stokes was aware of

Plaintiff's leave requests and absences from work associated with her chronic condition.  See

Depo. of Cherlyn Stokes (Doc. 34-2 at 48-49).  Given this fact and the close temporal

18

proximity between Plaintiff's March leave and her termination, Plaintiff has established a *prima facie* case of retaliation.

Upon this showing, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for her termination. <u>McDonnell Douglas</u>, 411 U.S. at 802. Here, Defendant contends that Plaintiff was laid off as part of a RIF. <u>See</u> Def's Resps. and Objections to Pl's First Set of Interrogs. (Doc. 35-2 at 3). In support, Defendant submits the Affidavit of Stephen Barry, the President of PHC. According to Mr. Barry, he made the decision to reduce operating costs, including staff reductions, during the first quarter of 2004 because PHC was not meeting its annual revenue projections and a reduction in reimbursement levels. <u>See</u> Aff. of Stephen T. Barry (Doc. 27 at ¶ 4). He directed Lynn Tran to reduce operating costs in her department. <u>Id.</u> at ¶ 5. Ms. Tran claims she made the ultimate decision to terminate Plaintiff and that Plaintiff's physical and medical condition was not a consideration in the decision. <u>See</u> Aff. of Lynn Tran (Doc. 25 at ¶¶ 14-15). According to Ms. Tran, she selected Plaintiff for the RIF because her tasks were most easily absorbed by other employees who could also perform higher-level intake tasks and because the workload for nebulizers had decreased. <u>Id.</u> at ¶ 18. Additionally, Defendant cites to complaints about Plaintiff's telephone skills, Plaintiff's prior counseling for spending too much time on the internet, and Plaintiff's refusal to accept cross-training for intake functions as further support for its decision to lay off Plaintiff. <u>See</u> <u>id.</u> at ¶¶ 8-10, 11, 13, 21-22; Aff. of Cherlyn Stokes (Doc. 26 at ¶ 5-7).

Upon this articulation, the burden shifts back to the Plaintiff to demonstrate that Defendant's proffered reason is pretextual. <u>McDonnell Douglas</u>, 411 U.S. at 804. In support

19

of her argument that Defendant's proffered reason is unworthy of credence, Plaintiff cites to PHC's hiring record during 2004.  Plaintiff submits Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories, which reveals that PHC hired employees for the positions of Contract Manager, Phone Operator/Receptionist, and Assistant Customer Service Manager in the first quarter of 2004.  See (Doc. 35-2 at 3).  PHC also ran ads for a number of other positions in 2004, including "Referral/Cust. Service," "Financial Counselor/benefit verification/cust. service," "Receptionist/operator/data entry/clerical," "QA Specialist," "Contract Specialist," "Database/Systems Support Analyst," "Customer Service Representative," "Case applications/Data Entry Position," "Medical Biller DME/Home Health Collector & Cash Applications," "Case Application/Data Entry."  See (Doc. 36-2 at 6-48).  By Plaintiff's argument, such hiring efforts refute PHC's contention that it instituted a RIF to reduce operating costs or that she was laid off as part of such RIF.[9]

In a light most favorable to Plaintiff, such evidence is sufficient to raise a genuine issue of material fact as to whether Plaintiff was laid off in a reduction in force or terminated in retaliation for her taking leave under the FMLA.  Accordingly, Defendant's motion for summary judgment should be denied as to Counts II.

---

[9]Additionally, Plaintiff argues that even if there was a RIF, Plaintiff should have been retained because of her seniority and positive work record.  Plaintiff points to Courtney Lindsay, for example, as an individual over whom Plaintiff had seniority and whom Plaintiff trained, yet Ms. Lindsay was retained during the purported RIF.  See Depo. of Courtney Lindsay (Doc. 34-4 at 9, 11, 21-22).  Ms. Stokes testified that there were at least five other people with less seniority than Plaintiff.  See Depo. of Cherlyn Stokes (Doc. 34-2 at 43).  Plaintiff also submits an Employee Performance Evaluation dated January 29, 2003, and letters of recommendation from Ms. Stokes and Debaney Bernard as evidence of her positive work record.  See (Doc. 33-6, 33-7, 33-8).

D.

In order to establish a *prima facie* case of discrimination under the ADA or the FCRA,[10] the Plaintiff must prove that (1) she has a disability; (2) she is "qualified," with or without reasonable accommodations; and (3) she was subjected to unlawful discrimination because of her disability.  42 U.S.C. § 12112(a); Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (citing Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002)).  The ADA defines "disability" to include "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); see also Rossbach v. City of Miami, 371 F.3d 1354, 1356-57 (11th Cir. 2004).  A "major life activity" is defined in the regulations as "functions such as caring for oneself, performing manual asks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  An impairment "substantially limits" a major life activity of an individual when he is significantly restricted as to the condition, manner, or duration under which he can perform the major life activity as compared to the average person in the general population.  See 29 C.F.R. § 1630.2(j)(1).  When evaluating an ADA discrimination claim, the courts apply the McDonnell Douglas burden-shifting analysis.  See Cleveland, 369 F.3d at 1193 (11th Cir. 2004).

Defendant argues again that Plaintiff did not meet the definition of an individual with a disability.  It again contends that Plaintiff's impairment did not rise to the level of a disability

---

[10]The legal standards applicable to the ADA also apply to the FCRA.  See Chanda v. Engelhard/ICC, 234 F.3d 1219 (11th Cir. 2000).

21

either as she described it or as revealed in the medical records.  Defendant argues that Plaintiff

cannot establish that her impairment limited one or more of her major life activities and asserts,

in particular, that Plaintiff was not limited in the major life activity of working.  Defendant also

maintains that Plaintiff cannot adequately explain the inconsistencies in her statements

concerning her ability to perform the functions of her job.  Specifically, Defendant cites to her

representations to the Social Security Administration that she was unable to work because of

her disabling condition as of March 24, 2004.  See Depo. of Catherine Vasquez-Ortiz (Doc.

28-1 at 162-66).  Defendant also notes the inconsistency between this statement made to the

Social Security Administration and the statements that she made to the Florida Unemployment

Compensation Commission during the period after termination when she was collecting

benefits.  By those representations, she was ready, willing, and able to work.  See id. at 164.

Finally, Defendant again asserts that Plaintiff cannot establish that her termination was because

of her disability or that the stated reasons were pretextual.

    In support of her ADA and FCRA claims, Plaintiff claims that she was disabled and/or

regarded as disabled.[11]  She again argues that her well-documented medical condition,

Friedreich's Ataxia, substantially diminished her functional ability to see, hear, speak, and walk,

and as a result, she is substantially limited in her activities of daily living.  By her claim, she was

the only full-time employee in the customer service department who had a life-threatening

disease and who was let go.

---

[11]Plaintiff's memorandum does not develop the contention that she was regarded as
disabled apart from citing to the definition and certain regulations from the EEOC intended to
clarify the inquiry.  See (Doc. 33-1 at 15).

Initially, for purposes of this motion, I conclude Plaintiff has satisfied her initial burden of demonstrating that she has a disability, by reason of her Friedreich's Ataxia and the resulting substantial limitations on her ability to speak and walk and that the Defendant was adequately apprised of this condition. Further, it appears that Plaintiff was a qualified individual with a disability. Indeed, Defendant's motion, citing as it does the Plaintiff's testimony and her doctor's reports, appears to concede, that she could perform the essential functions of her job with or without accommodation. However, Defendant urges that because of inconsistent statements made on the matter, she is barred from pursuing the ADA claim. This contention merits further discussion.

In <u>Musarra v. Vineyard Development Corporation</u>, 343 F. Supp. 2d 1116, 1121-23 (M.D. Fla. 2004), the district court granted summary judgment on plaintiff's ADA and FCRA claims based on the plaintiff's statement in his application for Social Security disability insurance ("SSDI") benefits that he was totally disabled. In consideration of this statement made to the Social Security Administration, coupled with the plaintiff's application for and receipt of unemployment compensation benefits, the court determined that the plaintiff's prior statements were intended to create a sham by which plaintiff could claim disability benefits and then change his story to maintain an ADA claim. <u>Id.</u> at 1123. In explanation of the inconsistencies, Mr. Musarra attempted to explain that the contradictory positions were the result of different application dates, but he provided no explanation for contradictory positions for dates in the same period. <u>Id.</u> Because the record revealed no evidence to support that plaintiff could have worked with an accommodation, the court determined that the plaintiff had

23

engaged in a sham to pursue the ADA claim.  Applying the standard established in <u>Cleveland v. Policy Managment Systems Corp.</u>, 526 U.S. 795, 805-06 (1999), the court concluded that plaintiff's explanation fell far short of that required to create a factual dispute and granted summary judgment on plaintiff's ADA claim.  <u>See</u> <u>Musarra</u>, 343 F. Supp. 2d at 1123.

In <u>Cleveland</u>, the Supreme Court overruled a Fifth Circuit holding that the pursuit and receipt of Social Security benefits creates a rebuttable presumption that the claimant of such benefits is judicially estopped from asserting that he is a "qualified individual with a disability" for ADA purposes.  Finding that the seemingly inconsistent contentions called for by the Social Security Act and the ADA could often be made consistent with each other, the court held that the pursuit and receipt of SSDI benefits did not automatically estop the recipient from pursuing an ADA claim, nor is there a strong presumption against the recipient's success under the ADA.  <u>Cleveland</u>, 526 U.S. at 798-99.  However, the Court determined that an ADA plaintiff cannot ignore her SSDI contention that she was too disabled to work, and in order to survive a defendant's motion for summary judgment, "she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'"  <u>Id</u> at 797.  As for the trial court deciding a motion for summary judgment, the Court stated:

> When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim.  To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith believe in, the earlier statement, the plaintiff could

nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

Id. at 807.

Here, the undisputed facts reveal that Plaintiff applied for SSDI benefits on May 24, 2004, alleging disability as of March 24, 2004.  See (Doc. 28-5 at 5-6).  In the remarks section, Plaintiff stated, "I last worked on 03/24/2004 after being fired due to my disability."  Id at 6.  On or about September 17, 2004, Plaintiff was notified by the Social Security Administration she was entitled to SSDI benefits beginning September 2004.  See (Doc. 28-2 at 3).

The only explanation tendered to the court on this motion is that found in Plaintiff's deposition.  There, in response to the Defendant's inquiry, Plaintiff indicated:

> Q   -- about halfway down [the SSDI application], you say, "I became unable to work because of my disabling condition on March 24 of 2004."
>
> A   Yes , because I had depression.
>
> Q   All right.  And you state here, "I am still disabled."
>
> A   I'm still -- yes, I'm disabled.
>
> Q   Okay.  And so since you left Pediatric Health Choice, as you testified this morning, you have been unable to work, correct, because of your disability?
>
> A   If I would have still been working at Pediatric Health Choice, because I would have still been active, I would have still been okay, but being that I was let go, my -- my disability got worse.
>
> ---
>
> Q   Yeah.  I'm just asking you, as you testified this morning, as of your last day with Pediatric Health Choice, March 24, 2004, you've been unable to work?
>
> A   No, I haven't.
>
> Q   Is that correct?
>
> A   I tried to look for work, but nobody will give me work.

Q      All right.  I'm just asking you --

A      They sent me a paper in the mail stating that I can -- if I wanted to work, that, you know, that I could, and I told them I couldn't work.

Q      Okay.  I'm just asking you what you verified here under penalty of criminal offense is that you have been unable to work because of your disabling condition since March 24, 2004, correct? . . .

A      Yes.

Q      All right.  Now, during what period of time were you collecting unemployment compensation benefits?

A      After I got laid off.

Q      For how many weeks did you collect?

A      They gave it to me for six months. . . .

Q      And in order to collect unemployment compensation, you had to certify to the state periodically that you were ready, willing and able to work, correct?

A      And I was sending applications out, as -- I mean, resumes out, as I said.

Q      Well, which is true, that which you represented to the Social Security Administration that you're unable to work, or that which you represented to the Florida Unemployment Compensation Commission that you were ready, willing and able to work? . . .

A      I'm sorry. . . .

Q      Which of those is true, were you able to work or unable to work?

A      I was able to work, but when I got laid off, everything just came to me.  Everything just hit me.  I tried to send my resumes out, nobody replied because of my mental problems and my physical problems.

        . . .

By Mr. McCrea:

Q      My question is: After you left Pediatric Health Choice, were you able to work or were you unable to work?

A      No, I wasn't because they let me go.

(Doc. 28-1 at 163-66).

This testimony is not a model of clarity. However, in a light most favorable to Plaintiff, her explanation that she believed she was physically capable of performing her job at the time that she was terminated coupled with the circumstances suggesting that she could perform her job are sufficient to warrant a reasonable juror's concluding that, assuming the truth of or the plaintiff's good-faith believe in the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation. See Cleveland, 526 U.S. at 807. Unlike in Musarra, the court cannot conclude as a matter of law that Plaintiff's claim is a sham, and sufficient matters in dispute raise genuine issues of material fact that precludes summary judgment. See Taylor v. Food World, 133 F.3d 1419, 1424 (11th Cir. 1998). As noted above, because the record reveals that at least one decision-maker, Cherlyn Stokes, was aware of Plaintiff's disability and her need for some accommodation by way of leave or an altered work schedule or otherwise, Plaintiff has satisfactorily established a *prima facie* case of ADA discrimination.

Upon this showing, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its employment decision. McDonnell Douglas, 411 U.S. at 802. Here, Defendant again contends that the decision-maker was unaware of a disability, and in any event, Plaintiff was not treated differently than other similarly situated employees. Thus, those employees who were laid off were let go because of the RIF, and those employees who were retained were capable of performing both the Plaintiff's job and intake functions that Plaintiff had declined to learn.

In response, Plaintiff argues that Defendant's proffered reason is pretextual.  Again, Plaintiff argues that at least one of the decision-makers was aware of her disability, that she should not have been selected for any RIF because of her seniority and positive work performance,[12] and because there was no true RIF.  Plaintiff again notes that Defendant hired multiple employees after Plaintiff was laid off, and Defendant hired two employees into the customer service department in early 2004 before she was laid off.  Plaintiff also contends that Defendant has no documentation to support the RIF or that her position was absorbed as contended.

For the reasons previously expressed and in a light most favorable to the Plaintiff, such evidence raises a genuine issue of material fact as to Defendant's motive for terminating Plaintiff's employment.  Accordingly, summary judgment is not appropriate as to Counts III and IV, Plaintiff's disability discrimination claims under the ADA and FCRA.

E.

To the extent that Plaintiff complains of a hostile work environment, her disability claims fails.  The Eleventh Circuit has not recognized a cause of action for disability harassment.  However, other federal courts have assumed that an ADA hostile work environment claim is actionable and applied the legal standards in Title VII hostile work environment claims.  See Schwertfager v. City of Boynton Beach, 42 F. Supp. 2d 1347, 1366 (S.D. Fla. 1999) (citing McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th

---

[12]Plaintiff suggests that she was more qualified than employees who were retained during the period of the alleged RIF.  Plaintiff's subjective opinion in this regard is given little weight, but there appears some support that less experienced employees were retained.

Cir. 1998)); Williamson v. Int'l Paper Co., 85 F. Supp. 2d 1184, 1187 n.3 (S.D. Ala. 1999).

Assuming *arguendo* the ADA provides a cause of action based on hostile work environment,

Plaintiff must prove that (1) she belongs to a protected group; (2) she was subjected to

unwelcome harassment; (3) the harassment complained of was based on her disability or

disabilities; (4) the harassment complained of affected a term, condition, or privilege of

employment; and (5) the employer knew or should have known of the harassment and failed to

take prompt, remedial action. McConathy, 131 F.3d at 563.  To be actionable, the harassment

must be so severe and pervasive as to have the purpose or effect of unreasonably interfering

with Plaintiff's work performance or creating an intimidating, hostile, or offensive

environment.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Meritor Savings Bank v.

Vinson, 477 U.S. 57, 65 (1986); Sykes v. Pinellas Suncoast Transit Auth., 128 Fed. Appx.

100, 101 (11th Cir. 2005).  In determining whether an environment is "hostile" or "abusive,"

the court must consider the entirety of the circumstances, including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance.  Harris, 510 U.S. at 23.

Here, Plaintiff alleges that Robert Anderson, Vice President of PHC, called her a

"cripple" or "handicap girl" or "drunk" on multiple occasions  See Depo. of Catherine

Vasquez-Ortiz (Doc. 28-1 at 114, 133).  Plaintiff further testified that Mr. Anderson would

lean toward her when she walked the halls to cause her to hit the wall.  See id. at 128.  Plaintiff

asserts that Mr. Anderson made such remarks to her about three times weekly, and Plaintiff

claims she required psychiatric assistance because of these comments.  See id. at 113, 133.
Plaintiff admits however, she never complained to her management about this conduct.

Accepting for the reasons set forth above that Plaintiff is a qualified individual with a
disability and after careful consideration of all the evidence tendered by the Plaintiff, I conclude
she has failed to demonstrate that Mr. Anderson's conduct, notwithstanding its offensiveness,
was so objectively severe and pervasive that it affected a term, condition, or privilege of her
employment.[13]  Accordingly, summary judgment is also appropriate as to her hostile work
environment claims raised in Count III and IV.

F.

Finally, as to Plaintiff's claims of retaliation under the ADA and FCRA, Plaintiff must
show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse
employment action; and (3) the adverse action was causally related to the protected
expression.  Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004) (quoting Shotz v. City
of Plantation, FL., 344 F.3d 1161, 1180 (11th Cir. 2003)); see also 42 U.S.C. § 12203.

Here, Plaintiff has failed to demonstrate that she engaged in statutorily protected
expression for which Defendant retaliated against her.  The record does not indicate that

---

[13]Upon this conclusion, the court finds it unnecessary to address the Defendant's
affirmative defense that it exercised reasonable care to prevent and correct promptly any
sexually harassing behavior and that the Plaintiff failed to complain about Mr. Anderson's
conduct or otherwise take advantage of PHC's preventative or corrective opportunities.  See
Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  The court notes, however, that
the Faragher defense is not available when a supervisor's harassment culminates in a tangible
employment action such as discharge.  See id. at 808.

Plaintiff made any complaint about disability discrimination or otherwise opposed an unlawful employment practice during her employment that resulted in her termination.  Therefore, Defendant's motion for summary judgment should be granted as to her retaliation claims raised in Counts V and VI.


IV.

For the foregoing reasons, it is RECOMMENDED that the court GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment (Doc. 24).  In particular, it is recommended that the court grant Defendant's motion as to Plaintiff's hostile work environment claims under Counts III and IV and her disability retaliation claims raised in Counts V and VI and that the court deny the motion as to Plaintiff's FMLA claims raised in Counts I and II and the remainder of her disability discrimination claims under Counts III and IV.

Respectfully submitted on this
19th day of September 2005.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; see also Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record